IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | |
|---|---|
| RALPH J. CARTER, | ) |
|     Plaintiff | ) Case No. 1:19-cv-000112 |
| vs. | ) |
| | ) HON. RICHARD A. LANZILLO |
| SLATER, COCHRAN, and LUTZ, | ) UNITED STATES MAGISTRATE JUDGE |
|     Defendants | ) MEMORANDUM OPINION |
| | ) ON DEFENDANTS' MOTION FOR |
| | ) SUMMARY JUDGMENT |
| | ) ECF NO. 35 |

This case comes before the Court on a Motion for Summary Judgment (ECF No. 35) filed by Defendants Jeremy Cochran ("Cochran"), Zachery Lutz ("Lutz"), and Corrections Officer Slater ("Slater") (collectively, "Defendants"). For the reasons discussed herein, Defendants' motion will be GRANTED in part and DENIED in part.

**I.  Background and Procedural Posture**

Plaintiff Ralph J. Carter ("Carter"), an inmate in the custody of the Pennsylvania Department of Corrections ("DOC"), commenced this civil rights action pursuant to 42 U.S.C. § 1983 against three corrections officers at the State Correctional Facility at Forest ("SCI-Forest"). *See* ECF. No. 7 (Complaint). His Complaint alleges that the Defendants violated his rights under the First and Fourteenth Amendments to the United States Constitution. *See id.* The Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56 and filed a supporting brief, Concise Statement of Material Facts, and an appendix of exhibits in support of the motion. (ECF Nos. 35-38). Carter filed two Briefs in Opposition that appear to be identical

1

(ECF Nos. 42, 44),[1] a Counter-Statement of Facts (ECF No. 43), and an appendix of exhibits (ECF No. 45). Defendants filed a Reply Brief. (ECF No. 46). All parties have consented to the jurisdiction of a United States Magistrate Judge under 28 U.S.C. § 636(c)(1). *See* ECF Nos. 2, 14. The matter is ripe for disposition

II.   **Material Facts**

At all times relevant to the case, Carter has been incarcerated at SCI-Forest. *See* ECF No. 36 at 1. On April 10, 2017, Carter and another inmate, James Heller ("Heller"), were escorted to the law library to work on legal matters. Carter requested that Heller be allowed to go to the law library to assist him with his legal work. *See* ECF 45-1, ¶ 1; ECF No. 7, ¶ 14.[2] Once placed in their secured cubicles, and upon request, Cochran delivered legal material from Carter to Heller. *See* ECF No. 7, ¶¶ 23-25. About an hour and a half later, Slater entered the law library and informed Carter and Heller that their law library session was over. *See id.*, ¶ 27. When Slater unlocked Heller from his cubicle, Heller handed Carter's legal materials to Slater and asked him to return them to Carter. *See id.*, ¶ 29. Slater inspected the documents and stated, "Oh, he's helping you file lawsuits against the jail. You won't be getting this back it's contraband." *Id.*, ¶ 30. Carter explained to Slater that he had given Heller permission to have the documents, but Slater said he would be giving the legal material to Lieutenant Haggerty

---

[1] Carter's filing at ECF No. 42 includes copies of his Brief [44], Counter Statement of Facts [43], and Appendix [45].

[2] The Court will consider Carter's verified Complaint (ECF No. 7) as part of the summary judgment record. *See Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as an affidavit on summary judgment motion); *Boomer v. Lewis*, 2009 WL 2900778, at *2 n.4 (M.D. Pa. Sept. 9, 2009) ("A verified complaint may be treated as an affidavit in support of or in opposition to a motion for summary judgment if the allegations are specific and based on personal knowledge.").

("Haggerty"). *See id.*, ¶¶ 32, 35. Heller was escorted back to his cell, and later that day both inmates were charged with misconduct.[3] *See id.*, ¶¶ 33, 46-7.

Before leaving the law library, Carter asked to speak to Haggerty. When Haggerty came to the law library, Carter explained the situation to him and said the confiscated paperwork included a time sensitive Post Conviction Relief Act ("PCRA") criminal appeal. *See* ECF No. 7, ¶¶ 38-41. Haggerty said the confiscated items were sent to the security department and a Confiscated Items Receipt ("CIR") would be issued.[4] Haggerty further informed Carter that he could write to the security department to have the paperwork returned to him. *See id.*, ¶ 42. Carter requested that the number of pages included in the legal materials be documented on the CIR. *See id.*, ¶ 43. While the number of pages was not recorded, the thickness of the legal material was listed on the CIR as approximately three inches. *See* ECF No. 45-5, p. 2.

On April 11, 2017, Carter informed Cochran about what had happened, and Cochran told him "not to worry about the misconduct because he would take care of it." *See* ECF No. 45-1, ¶ 15; ECF No. 7, ¶¶ 47-48. Cochran acknowledges that he allowed Carter and Heller to exchange paperwork despite a prison policy that classifies legal documents possessed by an inmate who does not own them as "contraband."[5] *See* ECF No. 36, p. 1. Later that day, Cochran came to Carter's cell and presented him with a manila envelope containing the legal

---

[3] "Possession of contraband by an inmate may result in a misconduct in accordance with the provisions of Department policy DC-ADM 801." DC-ADM 815 (3)(C)(2). [ECF No. 38-1, pp. 33-36 (Ex. F)].

[4] The CIR was issued to Heller because the paperwork was seized from Heller's possession not Carter's.

[5] DC-ADM 815(3)(C)(1)(o). "Contraband falls into the following categories: [P]roperty belonging to another inmate."

3

materials that Slater had confiscated.[6] *See* ECF No. 7, ¶ 49; *see also* ECF No. 38-1, p. 8. Carter opened the envelope and discovered that unspecified legal documents were missing. *See* ECF No. 45-1, ¶ 11 (Carter Affidavit) ("several documents were missing"); ECF No. 7, ¶ 51 (verified Complaint) (discovered "a number of legal documentations missing").[7] Nowhere in the record, however, does Carter identify specifically what documents were missing.[8] Slater later taunted Carter about the missing documents, saying, "How's the lawsuit coming along?"; "Did you find your legal work yet buddy?"; and "You should look in the trash." ECF No. 7, ¶ 56. At some point following this incident, Slater told Carter that he destroyed his legal work and that in the future, he should think twice about filing lawsuits against Slater's co-workers. *See* ECF No. 45-1, ¶ 13.

On April 13, 2017, Carter appeared before a hearing examiner regarding the misconduct report and was informed that the misconduct charges were dropped because Cochran had explained to the hearing officer that he had given Carter and Heller permission to share the legal paperwork. *See* ECF No. 7, ¶ 53-4; ECF No. 37, ¶¶ 15,16.

---

[6] The initial review response to Carter's Grievance 674331 states that Captain Gill returned the material to Carter on April 21, 2017, and that Gill attested to the fact that all the paperwork picked up from the security office, approximately three inches, was returned to Carter. (ECF No. 38-1 at 9-10).

[7] In his Complaint, Carter alleges that he told Lt. Haggerty that his legal papers included materials regarding his PCRA proceeding concerning which he faced an approaching filing deadline. *See* ECF No. 7, ¶ 41. However, neither Carter's Complaint nor his affidavit state that his PCRA papers were missing when Cochran returned his confiscated documents. Further, he makes no allegation that he missed his PCRA filing deadline.

[8] In his Brief in Opposition to the pending motions, Carter states that "witness statements, affidavits, PCRA paperwork, discovery material, and other important documents" were not returned or were destroyed. *See* ECF No. 42, p. 4. However, the Court may not consider this unsworn representation in opposition to the pending motions because it was not included in Carter's Counter-Statement of Material Facts and is not supported by any record material before the Court. *See Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 720 (3d Cir. 1989) ("statements made in briefs are not evidence of the facts asserted"); *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985) ("[l]egal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion").

### III. Standard and Scope of Review

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *See Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *See Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

**IV.    Discussion and Analysis**

Count I of the Complaint claims that the Defendants violated Carter's First Amendment freedom of speech rights when Slater confiscated his legal papers and one or more of the Defendants later destroyed some of them. *See* ECF No. 7, ¶¶ 64-65. Count II claims that Defendants violated Carter's Fourteenth Amendment rights because "they acted as a unit in retaliatory conduct against Plaintiff by confiscating and disposing of his legal documents and also subjecting him to bad treatment due to him [sic] preparing to file an action against other SCI-Forest correctional staff." *Id.* ¶¶ 66-68. The sufficiency of the record to support each count is examined below.

**A.    First Amendment Claims**

To a certain extent, the parties are "ships passing in the night" when it comes to Carter's First Amendment freedom of speech claim. The Defendants initially construed Carter's allegations regarding confiscation and destruction of his legal papers as asserting solely a Fourteenth Amendment deprivation of property claim and as a purported "adverse action" in support of a First Amendment retaliation claim. In his brief in opposition to the Defendants' motion, Carter clarified that he is asserting a stand-alone First Amendment "freedom of speech"

and "freedom of the press" claim based on the confiscation and destruction of his legal papers. *See* ECF No. 42, p. 2. In their Reply Brief, Defendants responded to this clarification by defending the confiscation of Carter's legal papers based on a Department of Corrections ("DOC") policy that classifies an inmate's possession of property belonging to another inmate as possession of "contraband." *See* ECF No. 46. Defendants did not address Carter's argument that Defendants intentionally destroyed certain of Carter's legal papers and, in doing so, violated his First Amendment rights. Based on the foregoing, the Court understands Carter to be asserting both a stand-alone First Amendment claim and a First Amendment retaliation claim. Each claim is addressed below.

### 1. Carter's allegations as a stand-alone First Amendment claim

The First Amendment forbids government action "abridging the freedom of speech, or of the press, or the right of the people to peaceably assemble, and to petition the Government for a redress of grievances." *Branch v. Stoke*, 2009 WL 483893, at *8 (D.N.J. Feb. 24, 2009) (quoting U.S. Const. amend. I). Prisoners retain these rights, albeit significantly restricted, provided the actions of the inmate do not threaten the security of the prison or undermine other legitimate penological interests. *See Beard v. Banks*, 548 U.S. 521 (2006) (holding that forbidding inmates' access to newspapers, magazines, and photographs does not violate the First Amendment in the context of a high security prison.).

At the outset, the Court finds Carter's invocation of principles of "freedom of the press" to be facially without merit. Carter does not explain how the confiscation of his legal papers implicates press freedoms, and the Court can discern no such relationship. Carter's "freedom of speech" claim based on Slater's confiscation of his legal papers and the alleged destruction of certain of those papers, however, is more layered. The initial confiscation of his papers was

7

pursuant to a DOC policy relating to the possession of "contraband." DOC Policy DC-ADM 815 defines "contraband" generally "as any item possessed by an inmate or found within the facility that is prohibited by law or expressly prohibited by those legally charged with the administration and operation of the facility or program." DC-ADM 815 (1)(C). "Contraband" within the meaning of the policy is further specified to include "property belonging to another inmate." DC-ADM 815 (C)(1)(o). Determining the constitutional validity of this policy involves a two-step analysis. First, the Court assesses whether the policy infringes upon First Amendment rights. If the Court finds that it does, the Court next applies the four factors set forth in *Turner v. Safley*, 482 U.S. 78 (1987). Those factors are: (1) "whether the regulation bears a 'valid, rational connection' to a legitimate and neutral government objective;" (2) "whether prisoners have alternative ways of exercising the circumscribed right;" (3) "whether accommodating the right would have a deleterious impact on other inmates, guards, and the allocation of prison resources generally;" and (4) "whether alternatives exists that 'fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests.'" *Fraise v. Terhune*, 283 F.3d 506, 513-14 (3d Cir. 2002) (quoting *Turner*, 482 U.S. at 89-90)).

In this case, Carter has not expressly challenged the constitutionality of DC-ADM 815, either generally or as applied to legal papers exchanged between inmates. Nevertheless, assuming Carter intended to raise such a challenge, precedent compels its rejection. As a threshold matter, the Supreme Court has made clear that no special or enhanced First Amendment protections are afforded to legal communications between prisoners. *See Shaw v. Murphy*, 532 U.S. 223, 225 (2001). Prisoners do not possess a First Amendment right to provide legal assistance to each other beyond the protection provided by *Turner*. *See id.* And, applying

8

*Turner*, the Supreme Court has held that prison officials have legitimate penological interests in restricting legal communications between inmates. In *Shaw*, the Court explained:

> [E]ven if we were to consider giving special protection to particular kinds of speech based upon content, we would not do so for speech that includes legal advice. Augmenting First Amendment protection for inmate legal advice would undermine prison officials' ability to address the "complex and intractable" problems of prison administration. *Turner, supra*, at 84. Although supervised inmate legal assistance programs may serve valuable ends, it is "indisputable" that inmate law clerks "are sometimes a menace to prison discipline" and that prisoners have an "acknowledged propensity ... to abuse both the giving and the seeking of [legal] assistance." *Johnson v. Avery*, 393 U.S. 483, 488, 490 (1969). Prisoners have used legal correspondence as a means for passing contraband and communicating instructions on how to manufacture drugs or weapons. *See* Brief for State of Florida et al. as Amici Curiae 6-8; *see also Turner, supra*, at 93 ("[P]risoners could easily write in jargon or codes to prevent detection of their real messages"). The legal text also could be an excuse for making clearly inappropriate comments, which "may be expected to circulate among prisoners," *Thornburgh v. Abbott*, 490 U.S. 401, 412 (1989), despite prison measures to screen individual inmates or officers from the remarks.

*Id.* at 231.

Prison officials at SCI-Forest cited penological concerns akin to those identified in *Shaw* when they responded to a grievance Carter filed following the confiscation of his legal papers from Heller. The Grievance Officer's Initial Review Response to Carter's grievance explained, for example, "The practice of inmates loaning and borrowing property leads to many allegations of missing property which is one of the many reasons that this practice is not permitted." ECF No. 38-1, p. 10. DC-ADM 815 is neutral in classifying essentially all property possessed by an inmate that belongs to another inmate as "contraband," which is subject to confiscation. Further, inmates have access to prison law libraries and other prison resources and may communicate with organizations outside the prison as alternative means to secure the legal information and assistance they desire. And the record includes no evidence that alternatives to the policy exist that would accommodate prisoners' rights at a *de minimis* cost to valid penological interests.

9

Thus, all four *Turner* factors weigh in favor of the validity of DC-ADM 815 as it applies to legal papers exchanged between inmates.[9]

Further, any First Amendment freedom of speech claim based on Carter's alleged loss or destruction of some of his legal papers fails on the record in this case. This is because an isolated instance of the destruction of an inmate's legal papers, such as Carter asserts here, cannot support a freedom of speech claim. *See Fortune v. Hamberger*, 379 Fed. Appx. 116, 120 (3d Cir. 2010) (a single instance where prison officials intercepted or tampered with inmate's legal mail does not support a First Amendment claim). Such action may constitute a First Amendment violation only if it occurs as part of a "pattern or practice." *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006). "[A] single instance is usually not enough." *Gibson v. Erickson*, 830 Fed. Appx. 372, 373 (3d Cir. 2020) (citing *Bieregu v. Reno*, 59 F.3d 1445, 1452 (3d Cir. 1995), *overruled on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996)); *see also Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). The record includes no evidence that Carter's legal papers were destroyed or discarded as part of a pattern or practice at the prison. The alleged tampering with Carter's legal papers did not occur pursuant to the DOC's contraband policy. The policy was not invoked as authority to destroy any of Carter's papers. Carter acknowledges, in fact, that prison officials directed that his legal papers be returned after Cochran advised them that he had given permission for Heller to possess them. Thus, the record in this case does not support a stand-alone First Amendment freedom of speech or freedom of the press claim.

---

[9] Any First Amendment claim by Carter based on a challenge to DC-ADM 815 is also undermined by his acknowledgement that prison officials directed that Carter's legal papers be returned to him. Although Carter alleges that some of his papers were lost or destroyed in the process, this did not occur pursuant to the DOC policy.

### 2. First Amendment Retaliation Claim

Cochran allowed Carter to share his legal papers with Heller during their law library session on April 10, 2017. At the end of the session, Heller asked Slater to return Carter's legal papers to Carter. Slater refused to do so and, instead, confiscated the papers pursuant to Policy DC-ADM 815, which, as noted, classifies an inmate's possession of another inmate's property as possession of contraband. That same day, a CIR was issued stating that approximately three inches of paperwork had been confiscated. *See* ECF No. 38-1, p. 9. Carter asserts that when the paperwork was later returned to him, some documents were missing, although the summary judgment record does not specifically identify the missing documents. Carter alleges that the Defendants failed to return some of the documents in retaliation for his expressing his intention to file a lawsuit against the prison.

To support a retaliation claim, a prisoner must produce evidence that (1) he engaged in protected conduct; (2) prison officials took an adverse action against the plaintiff that was "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights"; and (3) the existence of "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *See Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir. 2001) (quoting *Allah v. Seiverling,* 229 F.3d 220, 225 (3d Cir. 2000) (alteration in original)); *Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir. 2003). Here, the record includes evidence that Carter engaged in protected activity. Although he had not yet filed his threatened lawsuit when Slater allegedly destroyed or discarded his legal papers, Carter's preparation of the suit and his known intention to file it are enough to satisfy this first element of his claim. *See Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (prisoner engaged in protected activity where he "informed prison officials of his intent to file a grievance and requested an appropriate form"); *Cooper v. Garman*,

11

2021 WL 4033113, at *1 (M.D. Pa. Sept. 3, 2021) (finding a protected activity where defendants examined prisoner's possessions and confiscated legal documents, including interrogatories plaintiff was preparing for a separate civil action, as well as copies of grievances and affidavits prepared by other inmates).

Having identified evidence satisfying the first element of his retaliation claim, Carter must next show that an adverse action was taken against him. To satisfy this element of the claim, the action must have been one sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *See Jacobs v. Beard*, 172 Fed. Appx. 452, 455 (3d Cir. 2006). This requirement is not especially demanding. "[U]nless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should go to the jury." *Id.* (citing *Bell v. Johnson,* 308 F.3d 594, 603 (6th Cir. 2002)). In this case, Carter alleges that the two adverse actions taken against him were the confiscation of his legal papers and the subsequent loss of an unspecified portion of those papers. Carter posits that the missing materials were intentionally removed from his legal papers and then destroyed, presumably to frustrate his efforts to sue the prison.

The intentional destruction of important legal materials could reasonably deter a person of ordinary firmness from exercising his constitutional rights.[10] Nevertheless, as a threshold issue, the Court must also determine whether the record includes evidence sufficient to allow a

---

[10] The Court acknowledges that prison officials promptly directed that Carter's confiscated papers be returned to him and promptly dismissed the misconduct charge against Carter. The Court also notes that Carter does not contend that he was prevented from timely filing papers in any of his legal cases because of his missing documents. These facts, however, do not preclude a reasonable jury from finding that the alleged improper confiscation and subsequent destruction of legal documents would deter a person of ordinary firmness from exercising his constitutional rights. The Court agrees with the Defendants, however, that the mild taunting Slater allegedly directed at him, standing alone, does not support the adverse action element of Carter's retaliation claim. *See Chruby v. Kowaleski*, 534 Fed. Appx. 156, 161 (3d Cir. 2013). The Court also agrees that the withdrawn misconduct charge against Carter, standing alone, does not support the adverse action element of the claim. *See Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011).

reasonable jury to find that one or more of the Defendants, in fact, intentionally discarded or destroyed some of Carter's legal papers. In other words, the question is whether Carter has met his burden of producing evidence to support the personal involvement of each Defendant. Similarly, the Court must determine whether Carter's statement that "legal documents" were missing from his materials is sufficient to allow a finding that their loss was more than "inconsequential," such that it would deter a person of ordinary firmness from exercising his constitutional rights.

Regarding the first issue, a defendant in a § 1983 action "must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Saisi v. Murray*, 822 Fed. Appx. 47, 48 (3d Cir. 2020) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007)). It is the plaintiff's burden to "show that each and every defendant was 'personal[ly] involve[d]' in depriving him of his rights." *Kirk v. Roan*, 2006 WL 2645154, at *3 (M.D. Pa. Sept. 14, 2006) (quoting *Evancho v. Fischer*, 423 F.3d 347, 353 (3d Cir. 2006)). Allegations that broadly implicate multiple defendants without delineating individual conduct are legally insufficient. *See Van Tassel v. Piccione*, 608 Fed. Appx. 66, 69-70 (3d Cir. 2015).

The record does not support any personal involvement of Defendant Lutz. He is barely mentioned in Carter's Complaint (ECF No. 7) and completely omitted from Carter's declaration in opposition to Defendants' motion (ECF No. 45-1). Carter's Complaint merely states that Lutz participated with Cochran and another corrections officer in escorting Carter to and from the library. *See* ECF No. 7, ¶¶ 12, 26. Nothing in the record supports a finding that Lutz discarded or destroyed any of his legal papers or otherwise participated in any adverse action against him

or other conduct upon which a claim could be based. No genuine issue of fact remains for trial as to any claim against Lutz, and he is entitled to judgment as a matter of law.

The same conclusion applies to Defendant Cochran. Although he had more extensive interaction with Carter, the record does not support a finding that he confiscated, discarded, or destroyed any of Carter's papers. While Carter asserts that it was Cochran who delivered the envelope containing his papers to Carter's cell, this fact alone does not support an inference that he tampered with the documents. Indeed, the record belies such a finding. As Carter acknowledges, it was Cochran who advised prison officials that he had given permission for Heller to have possession of Carter's legal papers, and it was Cochran who took steps to cause the misconduct charge against Carter to be withdrawn. Thus, the record cannot support a finding that Cochran intentionally destroyed or discarded Carter's legal papers. Any such finding would be based on speculation. Therefore, Cochran is also entitled to summary judgment on this claim.

This leaves only Slater as a potentially viable defendant to this claim. Regarding Slater, the record is clear that he confiscated Carter's legal papers from Heller in accordance with Policy DC-ADM 815. *See* ECF No 45-1, ¶ 6 ("C.O. Slater, upon receiving the documents, began to go through them as if he was checking to assure that they did not contain contraband."). At the same time, the record includes evidence to support a finding that Slater's decision to confiscate the documents was motivated, at least in part, by the fact the papers related to a lawsuit Carter intended to file against other prison personnel. *See id.*, ¶ 7 ("C.O. Slater then stated, upon realizing and recognizing some of the civil documents, "oh he's helping you file a lawsuit, your (sic) not getting these back. It's trash."). In other words, the record includes evidence that Slater may have acted with "mixed motives" when he confiscated Carter's legal papers.

14

"If a prisoner establishes a *prima facie* case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that 'they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.'" *See Cooper v. Garman*, 2021 WL 4033113, at *8 (M.D. Pa. Sept. 3, 2021) (quoting *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001)). Stated differently, "[a] defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). Here, Slater's decision to confiscate Carter's papers from Heller was entirely consistent with, and arguably mandated by, DOC policy and served legitimate penological interests. Thus, the Defendants have met their initial burden of production regarding the "same decision" defense. This, however, does not conclusively establish that defense. Upon such a showing, the burden shifts back to the plaintiff to (1) produce "other evidence" of the defendant's retaliatory motive, and (2) demonstrate that the prisoner's violation of prison policy was "not so 'clear and overt'" that the court can conclude that the defendant would have taken the same action despite this evidence. *Watson*, 834 F.3d at 426. Upon such a showing by the plaintiff, the burden of proof reverts to the defendant, making the entry of summary judgment for the defendant inappropriate.

In this case, the Court cannot say as a matter of law that Carter's violation of prison policy was so clear and overt that Slater would have confiscated his papers even if they had not related to a planned lawsuit against prison personnel. Indeed, Cochran, a fellow corrections officer, apparently did not view the violation of DC-ADM 815 as clear and overt as evidenced by his decision to permit Heller to possess Carter's legal papers. This evidence precludes the Court from granting summary judgment in favor of Slater based on the "same decision" defense.

*Watson* compels this outcome despite the "great deference" that is normally given to prison officials when making disciplinary decisions.[11] *See id.* Accordingly, the Court will deny the Defendants' motion for summary judgment as it relates to Carter's First Amendment retaliation claim based on Slater's confiscation of his legal papers.

This leaves Carter's related claim that Slater further retaliated against him when he discarded or destroyed some of his legal papers. This claim first requires the Court to determine whether the record could support a reasonable jury's finding that Slater, in fact, intentionally discarded or destroyed Carter's papers. In support of an inference that Slater did so, Carter presumably relies on two items of circumstantial evidence—the fact that Slater had possession of his papers and the opportunity to tamper with them before they were returned to him, and the various statements Carter attributes to Slater regarding the missing documents. Here too, the Court finds that the evidence is minimally sufficient to allow the issue to survive summary judgment. An adverse consequence "need not be great in order to be actionable"; rather, it need only be "more than *de minimis*." *Watson*, 834 F.3d at 423. While Carter's failure to identify precisely what papers were lost or destroyed makes it difficult to determine whether Slater's action was more than *de minimis*, Defendants have not argued this point and the Court cannot say as a matter of law that a corrections officer's intentional loss or destruction of this unspecified portion of an inmate's legal papers would not deter a person of ordinary firmness

---

[11] Reconciling the "clear and overt" standard with this deference can be especially problematic in a mixed-motive case such as this one. *See Watson*, 834 F.3d at 431 (Hardiman, J., dissenting). Under *Watson*, it appears that a violation that is less than clear and overt, coupled with other evidence of retaliatory motive, is sufficient to allow the jury to find that defendant's reliance on a rule violation or misconduct charge for an adverse action is pretextual and that the true motivation for the action was retaliation. The Court also acknowledges the admonition that "[b]ecause retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner." *Miskovitch v. Hostoffer*, 721 F. Supp. 2d 389, 396 (W.D. Pa. 2010) (citing *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996)).

from exercising his rights.[12]  Further, because Slater's alleged destruction of some of Carter's papers cannot be viewed as having been done pursuant to DOC policy or a legitimate penological interests, the "same decision" defense is not available in response to this aspect of Carter's retaliation claim.  Finally, the statements Carter attributes to Slater represent some circumstantial evidence of retaliatory motive and arguably an admission that he destroyed some of Carter's documents.  *See Watson*, 834 F.3d at 424.  Thus, genuine issues of material fact remain such that Slater is not entitled to judgment as a matter of law on Carter's First Amendment retaliation claim based on the destruction of a portion of his legal papers.

For the foregoing reason, summary judgment on Carter's First Amendment retaliation claim will be entered in favor of Defendants Lutz and Cochran but denied as to Defendant Slater.

**B.     Fourteenth Amendment Due Process and "Access-to-Court" Claims**

Carter has failed to support a claim under any other constitutional provision based on the loss or destruction of his legal papers.  Carter has no viable Fourteenth Amendment claim for deprivation of property without due process because he had meaningful post-deprivation remedies available to him to address this loss.  *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available.").  Specifically, Carter had the right to file a grievance through the prison administrative process or to file a conversion and replevin action in state court.  Indeed, the record confirms that Carter filed a grievance on this matter before commencing this action in federal court.  Accordingly, to the

---

[12] Carter acknowledges that the loss of the documents did not cause him to miss any filing deadlines or lose any legal rights or claims.  While this acknowledgement somewhat belies the materiality of the missing documents, the issue remains one for the jury to decide.

extent Carter asserts a Fourteenth Amendment procedural due process claim, this claim fails as a matter of law.

Finally, although it is far from clear that Carter is asserting an "access-to-court" claim under the First Amendment against the Defendants, any such claim fails based on the complete absence of allegations or evidence that he suffered an actual injury because of Defendants' alleged actions. To allege such a claim, a plaintiff must show that he: (1) suffered an "actual injury" by being shut out of court or losing an arguably meritorious claim; (2) that the defendant proximately caused the alleged violation of plaintiff's rights; and (3) he has "no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial of access suit." *See Monroe v. Beard*, 536 F.3d 198, 206 (3d Cir. 2008). "To that end, prisoners must satisfy certain pleading requirements: The complaint must describe the underlying arguable claim well enough to show that it is 'more than mere hope,' and it must describe the 'lost remedy.'" *Id.* (quoting *Christopher v. Harbury*, 536 U.S. 415, 416 (2002)). Thus, unlike conduct sufficient to constitute an "adverse action" for purposes of a retaliation claim, which need only be more than *de minimis*, a prisoner asserting an access-to-court claim must show an "actual injury" in the form of a lost claim or remedy. *Id.* Carter's Complaint alleges no facts to support an arguable claim or lost remedy. The record is likewise devoid of evidence to support findings in favor of Carter on these elements. Accordingly, summary judgment in favor of the Defendants on this claim is also appropriate.

### V.     Conclusion

For the foregoing reasons, the Defendants' Motion for Summary Judgment (ECF. No 35) will be GRANTED in part and DENIED in part.

A separate Order follows this Memorandum.

Entered this 30th day of November 2021.

                                            */s/ Richard A. Lanzillo*
                                            HON. RICHARD A. LANZILLO
                                            United States Magistrate Judge